Matthew Miller, Esq. (SBN 185741)
matt@millermlaw.com
LAW OFICES OF MATTHEW MILLER
755 Fresca Court
Solana Beach, California 92075
Telephone: (858) 755-6688
Facsimile: (425) 962-7935

Attorney for Plaintiff Zachary Miller

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZACHARY MILLER, an individual,<br><br>  Plaintiff,<br><br>vs.<br><br>EASY DAY STUDIOS PTY LTD, an Australian proprietary limited company; REVERB COMMUNICATIONS, INC., a California corporation; and DOES 1-25 INCLUSIVE,<br><br>  Defendants. | Case No.: 3:20-cv-02187-LAB-DEB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLANTIFF'S COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16**<br><br>Date: March 15, 2021<br>TIME: 11:15 A.M.<br>CRTRM: 14A<br>Judge: Hon. Larry A. Burns |

## TABLE OF CONTENTS

I. <u>INTRODUCTION</u> ...................................................................................... 1

II. <u>STATEMENT OF FACTS</u> ........................................................................ 2

III. <u>ARGUMENT</u> ............................................................................................. 5

   A. Miller's Publicity Rights ........................................................................ 6

   B. The First Amendment Does Not Entitle Defendants to Appropriate Miller's Likeness .............................................................................................. 6

      1. Not Transformative - The First Amendment is Not an Available Defense for Defendants ............................................................................. 7

      2. Miller's Likeness Adds Commercial Value to Videogame ........................ 8

      3. Skater XL Videogame Is Not a Substantial Public Interest ...................... 9

      4. The Ability of Users to Alter Avatar Is Not Transformative ................... 10

   C. Miller Did Not Consent to Defendants' Use of His Likeness ............... 10

   D. Defendants' Use of Miller's Likeness Is Not Incidental ....................... 12

   E. Miller Should be Awarded Attorney's Fees and Costs ......................... 14

IV. <u>CONCLUSION</u> ........................................................................................ 15

i

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLANTIFF'S COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Aligo v. Time-Life Books, Inc.*,
  1994 WL 715605, (N.D. Cal. Dec. 19, 1994) .................................................. 12

*Batzel v. Smith*,
  33 F.3d 1018 (9th Cir. 2003) ............................................................................. 5

*Davis v. Electronic Arts, Inc.*,
  775 F.3d 1175 (9th Cir. 2015) ............................................................. 5, 13, 14

*Hilton v. Hallmark Cards*,
  599 F.3d 894, 910, 96 U.S.P.Q.2d 1177 (9th Cir. 2010) ................................ 10

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*,
  724 F.3d 1268, 107 U.S.P.Q.2d 1629 (9th Cir. 2013). ............................ 7, 9, 10

*Mindys Cosmetics, Inc. v. Dakar*,
  611 F.3d 590, 95 U.S.P.Q.2d 1647 (9th Cir. 2010) ........................................ 14

*Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*,
  890 F.3d 828 (9th Cir. 2018) ........................................................................... 12

*Yeager v. Cingular Wireless LLC*,
  673 F. Supp. 2d 1089 (E.D. Cal. 2009) ........................................................... 14

*Zhang v. American Franchise Regional Center, LLC*,
  2016 WL 9137637 (C.D. Cal. July, 20, 2016) ................................................. 14


**STATE CASES**

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*,
  25 Cal.4th 387, 107, Cal.Rptr.2d 126, 21 P.3d 797 (2001) .......................... 6, 8

*Kirby v. Sega of America, Inc.*,
  144 Cal.App.4th 47, Cal.Rptr.3d 607 (2006) ................................................ 7, 8

*No Doubt v. Activision Publishing, Inc.*,
  192 Cal.App.4th 1018, 122 Cal.Rptr.3d 397, (2011) ........................................ 8


**STATUTES**

California Civil Code § 3344(a) ........................................................................ 6, 11

California Code of Civil Procedure § 425.16 ...................................................... 5, 9

ii

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16

**OTHER AUTHORITIES**

*McCarthy on Trademarks and Unfair Competition* § 28:7 (5th ed.2020) .................. 6

Restatement Second of Contracts, §19. ..................................................................... 11

iii

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLANTIFF'S COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16

## I. INTRODUCTION

Defendant Easy Day Studios Pty Ltd ("Easy Day"), joined by Defendant Reverb Communications, Inc. ("Reverb"), (collectively "Defendants"), admits that it knowingly and intentionally, without obtaining Plaintiff Zachary Miller's ("Miller") consent, produced a skateboarding videogame using Miller's likeness for one of the characters in a videogame. Miller, a world-class skateboarder, is one of the five professional skateboarders depicted in the videogame.

As a result of years of dedication to skateboarding, Miller has become a well-known and highly respected skateboarder. Because of his fame and skill as a skateboarder, he has been paid by third parties for over a decade, to use his likeness to promote various skateboarding and non-skateboarding goods and services. Arguably Miller's likeness is his most valuable asset. The unauthorized use of Miller's likeness is a violation of his statutory and common law rights of publicity and he has suffered injury as a result.

Miller did agree to wear several outfits during a photo shoot for Defendants, in order for Defendants to motion capture the clothing move on a body while the body is in motion, but he did not consent to the use of his likeness for any purpose.

Defendants erroneously claim that they have a First Amendment right to commercially exploit Miller's likeness without his consent. However, the Ninth Circuit is clear and unequivocal that the First Amendment is not a valid defense in situations like the instant matter.

Miller is able to establish a probability of success on his claims because (i) Defendants unauthorized use of Miller's likeness is definitively not "transformative" and is not protected by the First Amendment; (ii) Miller never consented to the use of his likeness in the videogame and the lack of consent is confirmed by Easy Day; and (iii) the use of Miller's likeness is central to the function of the videogame and the promotion thereof, thus the unauthorized use of Miller's likeness is not incidental.

Moreover, viewed in the larger context of Easy Day's actions surrounding the within matter, this Motion to Strike is, at best, just another effort by Easy Day, now joined by Reverb, in an ever growing list of delay tactics, intended to cause unnecessary costs and delay, and is frivolous. California's Anti-SLAPP statute provides for the award of costs and attorney's fees to plaintiff's when a motion to strike is intended to delay or is firvolous. Cal. Code Civ. Pro. § 425.16(c)(1).

Defendants' application of the Anti-SLAPP statute is not appropriate, the Court should deny Defendants' motion to strike and award Miller attorneys' fees and costs.

## II.     STATEMENT OF FACTS

Miller is a world-class professional skateboarder, who has been paid by companies to endorse their products and appear in advertisements for over a decade. (Miller Declaration, ¶ 3).  Moreover, Miller has been paid to endorse some of the largest and most prominent brands in skateboarding. Just a couple of examples are: Quiksilver, where Miller was featured in a global marketing campaign. (*Id*., ¶ 4). And Nixon, where Miller has featured on a Nixon billboard, in multiple marketing campaigns and is listed on Nixon's team webpage next to fellow teammates/peers, who include, a member of the US Olympic skateboarding team and a two time champion of the World Surf League Men's Championship Tour. (*Id*., ¶ 5).

Miller has also been paid for the use of his likeness by companies not associated with skateboarding. Google, the internet search company, paid Miller thirty thousand ($30,000) dollars to appear in a one-minute video advertisement. (*Id.*, ¶ 6).

Confirming Miller's status as a top-level professional skateboarder, Miller has frequently appeared in editorial photographs and interviews in skateboard publications. (*Id.*, ¶ 8 and Brittain Declaration, ¶ 4). He was also featured in a program that aired on NBC broadcast television in 2009. (Miller Declaration, ¶ 7).

1  Miller is considered a world-class skateboarder, who is highly respected within the
2  skateboarding community. (Brittain Declaration, ¶ 3).
3      In April, 2019 Miller was contacted by Easy Day's Director of Marketing,
4  Jeff Goforth, who inquired if Miller would be willing to "model outfits" for a photo
5  shoot. (Goforth Declaration, ¶ 2). Miller agreed to model the clothing in order for
6  Defendants to motion capture the clothing moving on a person. (Miller Declaration,
7  ¶ 9). At no time prior to, during or after the photo shoot did Defendants request to
8  use Miller's likeness in a videogame, or for any other purpose, and Miller never
9  consented to have his likeness used by Defendants. (*Id.*, ¶ 11). To reinforce the
10 parties understanding of the purpose of the photo shoot, while Miller was being
11 scanned, Mr. Goforth assured Miller multiple times that Miller would not be
12 identifiable and Miller's likeness would not appear in the videogame. (*Id.*, ¶ 10)
13     Mr. Goforth confirmed Miller's understanding that only the clothing he wore
14 during the photo shoot would appear in the videogame when Mr. Goforth paid
15 Miller via Venmo, a mobile payment service, and he entered in the "what's it for?"
16 section of the application, three shirt emojis. (*Id.*, ¶ 1, Ex. 5). Defendants did not
17 acquire any rights to use Miller's likeness in their videogame.
18     Sometime after the photo shoot, Mr. Goforth texted a digital image of Miller,
19 that was created from the photo shoot, to Miller. Miller was amazed by how closely
20 the digital scan image resembled his face. (Miller Declaration, ¶ 12). Miller wrote,
21 "Whoa. That is super trippy." (Goforth Declaration, Ex. 1). Mr. Goforth replied,
22 "Yeah, crazy huh? **We still have a bunch to do** to actually get it animated but it's
23 coming along." (emphasis added) (*Id.*). After Miller asked how the scans of his
24 body and the clothing he wore would be used in the videogame, "what is the
25 character of me gonna be used for in the game?" Mr. Goforth states, "It won't have
26 your name anywhere or anything if you're worried about that haha." To which
27 Miller immediately responded "Sweet," indicating his confirmation agreement that
28 his name and his likeness would not be used in the videogame, as per the oral

3
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16

agreement. (Miller Declaration, ¶ 12).

In direct violation of the several promises made by Easy Day's Director of Marketing, Defendants used Miller's near exact likeness in the production and marketing of their skateboarding videogame. (Miller Declaration, ¶ 18).

Easy Day's Director, Dain Hedgpeth, states, in his declaration, that when Easy Day requested that Miller "model outfits" in April of 2019, Easy Day intended to use Miller's likeness for a character in its videogame. (Hedgpeth Declaration, ¶ 6). Defendants never discussed image usage rights with Miller or requested Miller sign a consent agreement granting Defendants the rights to use his image in their videogame. (Miller Declaration, ¶ 11). Within the videogame industry it is the industry standard to obtain the consent, in writing, from any person whose likeness is intentionally used in a videogame. (Batter Declaration, ¶ 2).

In late July of 2020 Miller began receiving notifications on Instagram that several people unknown to him, some acquaintances and some friends were "tagging" him on Instagram Stories about Miller being a character in a skateboarding videogame called *Skater XL*. (Miller Declaration, ¶ 14). Miller captured a few of the screenshots out of the approximately dozen Instagram Stories that identified him in *Skater XL*. (*Id*., ¶ 17). One of the Instagram Stories captured was from an acquaintance, named "Cyrus," with a screen name, "cyread," who Miller had met at Miller's local skatepark. "Cyrus" aspired to be a skateboard videographer and at one point asked if he could practice filming Miller skateboarding. Miller has not spoken with "Cyrus" in approximately two years. (*Id*., ¶ 14). Another was an Instagram Story posted was from a friend of Miller's, by the name of Tyler Richter, with the screen name "tylurgrom." Mr. Richter's younger brother was playing *Skater XL* and identified Miller as a character in the videogame. (*Id*., ¶ 15). Miller did not capture screenshots of the numerous other Instagram Stories that also identified him as a character in the *Skater XL* videogame

4

and these stories expire and disappear after twenty-four hours. (*Id.*, ¶ 17).

Immediately upon learning that his likeness was used in *Skater XL* (the date on the text is July 30, 2020 just two days after the release of the videogame), Miller texted Mr. Goforth to check to see if there was any paperwork for the photo shoot. (Goforth Declaration, Ex. 2). Shortly thereafter Miller's counsel contacted Easy Day's US attorney, and after initially responding, Easy Day's counsel refused to respond to multiple emails. (M. Miller, Esq. Declaration, ¶ 2).

In addition to Defendants' unauthorized use of Miller's likeness, skateboard brands that are associated with the *Skater XL* videogame have used Miller's likeness to promote their products. Some of these brands are direct competitors of Miller's sponsors. (Miller Declaration, ¶ 18). The use of Miller's likeness by these third-party skateboard brands is damaging to the companies Miller endorses. (Hosoi Declaration, ¶ 4).

As a result of Defendants' conduct, Miller has been deprived of valuable rights of publicity, specifically the right to control the commercial use of his likeness.

### III.   ARGUMENT

California's anti-SLAPP statute, Cal. Code of Civ. Pro. § 425.16, was created to address lawsuits that are brought to deter citizens from exercising their legal rights. *Batzel v. Smith,* 33 F.3d 1018, 1024 (9th Cir. 2003). If the cause of action is based on a defendant's right to free speech, a plaintiff is required to show that he or she has a "reasonable probability" of prevailing with their claim. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir.2001).

The standard of review of a motion to strike pursuant to Cal. Code of Civ. Pro. § 425.16 is extremely high. If a plaintiff can establish that they have a reasonable probability they will prevail, a motion to strike should be denied. *Davis v. Electronic Arts, Inc.*, 775 F.3d 1175, 1177 (9th Cir. 2015).

### A.     Miller's Publicity Rights

A plaintiff is able to make out a prima facie case for the infringement of the right of publicity if a) the plaintiff owns the rights to their identity and b) if the defendant has "used some aspect" of plaintiff identity, without plaintiff's permission. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 28:7 (5th ed.2020). California has codified the right to publicity in providing that:

> Any person who knowingly uses another's name, photograph, or likeness, in any manner, for purposes of advertising products, merchandise, goods, or services, ... without such person's prior consent ... shall be liable for any damages sustained by the person ... injured as a result thereof."

Cal. Civ. Code § 3344(a).

In the instant matter, Defendants admit that it knowingly and intentionally used Miller's likeness extensively as a character in its videogame and the marketing for it (Hedgpeth Declaration, ¶ 6). That use was without Miller's consent and Miller has suffered injury. Miller has established a prima facie case for the infringement of his right of publicity.

### B.     The First Amendment Does Not Entitle Defendants to Appropriate Miller's Likeness

In order to assert a First Amendment defense for the unauthorized use of a person's likeness, a defendant must demonstration that "the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 107, Cal.Rptr.2d 126, 21 P.3d 797 (2001). The transformation of a plaintiff's likeness must be significant in order for a defendant to claim its First Amendment rights as a defense to a claim of infringement of a plaintiff's right of publicity. *Id*, 106.

1. **Not Transformative - The First Amendment is Not an Available Defense for Defendants**

The Ninth Circuit makes it abundantly clear that a videogame, that uses the likeness of an athlete, performing their athletic pursuit, in a realistic setting of that athletic endeavor, is not transformative. *In re NCAA Student-Athlete Name & Likeness Licensing Litigation,* 724 F.3d 1268, 1274, 107 U.S.P.Q.2d 1629 (9th Cir. 2013). The plaintiff, Samuel Keller, in *In re NCAA* was a college football player, whose likeness was used, without his consent, in a football videogame made by Electronic Arts, Inc. ("EA"). Like Mr. Keller, Miller is an athlete (football player – skateboarder), and the videogame character bearing his likeness is performing the similar athletic actions for which he is known (playing football – skateboarding), in the context of the athletic endeavor (in a football game – skateboarding in a realistic skate park or street setting). "Given that *NCAA Football* realistically portrays college football players in the context of college football games, the district court was correct in concluding that EA cannot prevail as a matter of law based on the transformative use defense at the anti-SLAPP stage." *Id.* at 1278. In its promotional material, Defendants claim that its *Skater XL* videogame realistically portrays skateboarders in the context of skateboarding in real settings, which is exactly who and what Miller is, a skateboarder. "In *Skater XL*, players can shred legendary real-world skate spots that are home to some of the most iconic skaters and tricks in the world." (M. Miller, Esq. Declaration, ¶ 3). In *Skater XL* a player can literally have the Miller character skate in his home skatepark. (Miller Declaration, ¶ 16). There is nothing transformational regarding Defendants' unauthorized use of Miller's likeness.

A good example of what is considered "transformative" is found in *Kirby*, which Defendants incorrectly cite as support of their motion to strike. *Kirby v. Sega of America, Inc.*, 144 Cal.App.4th 47, Cal.Rptr.3d 607 (2006). The plaintiff in *Kirby* was a performing artist who had a "signature" lyrical expression, "ooh la la."

7

The videogame had a character with the name Ulala, that had an "extremely tall, slender computer-generated physique," with a hairstyle, primary costume, dance moves and was a "space-age reporter in the 25th century" all of which were "unlike any public depiction of Kirby." *Id*. at 616. "Ulala is a 'fanciful, creative character' who exists in the context of a unique and expressive video game." *Id*. at 618. In contrast, the only distinction that Defendants can make from the likeness of the videogame character and Miller, is eye color (the "generic" character's hair can be selected to match Miller's hair exactly). This is not a sufficient to meet the standard set in *Kirby*. The resemblance of the "generic" character to Miller is so close that third-parties, unknown to Miller, casual acquaintances and more likely than not, any neutral observer is able to see that the "generic" character in *Skater XL* highly resembles Miller.

When the unauthorized use of a person's digital likeness that is not transformative, it is violation of a plaintiff's right of publicity. *No Doubt v. Activision Publishing, Inc.*, 192 Cal.App.4th 1018, 122 Cal.Rptr.3d 397, 400, 411 (2011). As is the case here, Activision moved to strike the complaint, claiming that the plaintiff had violated California's anti-SLAPP statute. The court held that, the videogame was not "transformative" under the *Comedy III* test, because the "literal recreations of the band members," were doing "the same activity by which the band achieved and maintains its fame." *Id*. Defendants' unauthorized use of Miller's likeness is a violation of his publicity rights.

**2.      Miller's Likeness Adds Commercial Value to Videogame**

As part of its analysis as to whether a work is sufficiently transformative, the California Supreme Court writes, "courts **may** find useful a **subsidiary inquiry**, **particularly in close cases**: does the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted? *Comedy III Productions, Inc*., at 407 (emphasis added). In *Comedy III Productions, Inc*. the defendant's artistic work was T-shirts bearing the likeness of the Three Stooges

8

comedy act, where almost all of the value of the T-shirts relied on the reproduction of the likeness of the Three Stooges comedy act. The California Supreme Court thought such an economic analysis may be helpful, but did not required it in its transformational analysis. First, as discussed above, the within matter is not a "close case." Second, as part of its economic analysis in *In re NCAA*, the Ninth Circuit found that, "If EA did not think there was value in having an avatar designed to mimic each individual player, it would not go to the lengths it does to achieve realism in this regard." *In re NCAA,* at Fn. #7. Similarly, if Defendants did not think there was value in using a highly regarded professional skateboarder they would not have used Miller, a world-class skateboarder for the "generic" character. Defendants market their videogame as a realistic skateboarding game. (Hedgpeth Declaration, ¶ 4). What is more realistic than having all of the characters in the videogame be actual professional skateboarders? There is no significant transformation of Miller's likeness in Defendants' videogame, thus their First Amendment rights are not a defense to Miller's right of publicity claims. Miller is likely to prevail with his right to publicity claims.

### 3. Skater XL Videogame Is Not a Substantial Public Interest

Like EA, in *In re NCAA,* in its motion to strike pursuant to Cal. Code of Civ. Pro. § 425.16, Defendants make the claim that there is "a substantial public interest in *Skater XL* itself." (Dkt. 9, P. 8). The Ninth Circuit in *In re NCAA* found that that argument unpersuasive.

> We think that, unlike in Gionfriddo, Montana, and Dora, EA is not publishing or reporting factual data. EA's video game is a means by which users can play their own virtual football games, not a means for obtaining information about real-world football games. Although EA has incorporated certain actual player information into the game (height, weight, etc.), its case is considerably weakened by its decision not to include the athletes' names along with their likenesses and statistical data. EA can hardly be considered to be "reporting" on Keller's career at Arizona State and Nebraska when it is not even using Keller's name in connection with his avatar in the game. Put simply, EA's interactive game is not a publication of facts about college

football; it is a game, not a reference source. These state law defenses, therefore, do not apply.

*In re NCAA,* at 1283. Likewise, *Skater XL* is not a publication of facts about skateboarding. Defendants argue that because their *Skater XL* videogame is popular and has received numerous reviews, it is a public interest. (Dkt. 9, P. 8 and 9). Assuming, for argument's sake, that *Skater XL* is a popular videogame, it still doesn't change the fact that it does not report factual data. Further, more likely than not, EA's *NCAA Football* videogame also received numerous reviews and was equal to or greater in popularity to *Skater XL*. But the popularity of a videogame does not factor in the Ninth Circuit's public interest analysis. Additionally, Easy Day admits that it does not report any factual data about Miller or included his name. (Hedgpath Declaration, ¶ 4). *Skater XL* is simply a videogame where a user can have the Miller-looking character skate in a realistic virtual skatepark or street setting. Defendants' motion to strike should be denied.

**4.     The Ability of Users to Alter Avatar Is Not Transformative**

Defendants contend that because the "generic" character that bears Miller's likeness can be altered by the users, its unauthorized use is transformative. The Ninth Circuit has also rejected this argument, "the Third Circuit agreed with us that these changes ['the ability to modify the avatar'] do not render the NCAA Football games sufficiently transformative to defeat a right-of-publicity claim." *In re NCAA,* at 1278.

Defendants cannot meet the standard that no trier of fact could reasonably conclude that the use of Miller's likeness was not transformative. *Hilton v. Hallmark Cards*, 599 F.3d 894, 910, 96 U.S.P.Q.2d 1177 (9th Cir. 2010).

**C.     Miller Did Not Consent to Defendants' Use of His Likeness**

As detailed above (Pages 3-5) Defendants only bargained and paid for Miller to be scanned wearing various outfits, and the scans of those outfits would be incorporated into a videogame. At no time did Defendants request to use Miller's

10

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLANTIFF'S COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16

likeness and Miller never consented to have his likeness used in Defendants' videogame. (Miller Declaration, ¶ 11). Defendants knowingly used Miller's likeness as a character in the *Skater XL* videogame and the marketing and advertising of the videogame, without Miller's prior consent, causing injury. This is a violation of Miller's common-law and statutory publicity rights. California Civil Code § 3344(a).

The conduct of the parties can demonstrate the terms of an agreement. Conduct may often convey as clearly as words a promise or an assent to a proposed promise. Restatement (Second) of Contracts, §19 (1981). Defendants explicitly and implicitly agreed to only use the scans of the clothing that Miller wore at the photo shoot, and not use Miller's likeness on multiple occasions, including, but not limited to when, (1) Mr. Goforth's promised, during the photo shoot, that Miller's likeness wouldn't be used (Miller Declaration, ¶ 10), (2) Mr. Goforth only requesting that Miller "model outfits" (Goforth Declaration, ¶ 2). (3) Mr. Goforth highlighting clothing when paying Miller (Miller Declaration, ¶ 13, Ex. 5), (4) Mr. Goforth's text messages stating that the image sent to Miller wasn't final and would be changed, (Goforth Declaration, Ex. 1) and (5) Mr. Goforth stating that Defendants were not going to use Miller's "name anywhere or anything." (*Id.*). The actions of Defendants are consistent with the agreement entered into by the parties, i.e. that Defendants would only use the scans of the clothing and would not use his likeness in the videogame.

It is also extremely revealing that even in Defendants' declarations in support of their motion to strike, neither Mr. Goforth nor Mr. Hedgpath declare that they requested use or received permission to use Miller's likeness. Rather, Defendants solely rely on a brief text exchange to incorrectly claim that they have acquired the right to use Miller's likeness.

Defendants assert that when Miller expresses his amazement regarding the scanning technology that this is somehow him granting consent, it isn't. Or when

11

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16

Miller asks, "What is the character of me gonna be used for in the game?" that this is Miller consenting to the use of his likeness. (Dkt. 9, P. 4). This is a massive leap in logic unsupported by the facts. Obviously Miller posed for the photo shoot, so his body and the clothing he was wearing were scanned. Miller is simply asking what the intended use of the scans of his body would be. It does not stand to reason that, Miller, an experienced professional, who has been paid tens of thousands of dollars to participate in photo shoots, would only value his likeness for the use in a videogame at a mere two hundred fifty ($250) dollars. And it is even more improbably that Miller would be granting his consent via a very brief, tangential and informal text exchange.

Defendants would also like one to believe that "or anything" means something other than Miller's likeness, but what identifying information would be relevant to the videogame and in Defendants' possession? Only Miller's likeness.

While Miller never consented to the use of his likeness, if there is a question as to whether there was a meeting of the minds, it is a question of fact.

> …when an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply. But in such a case, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court.

*Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*, 890 F.3d 828, 834 (9th Cir. 2018). It is clear that Miller never consented to the use of his likeness and is likely to prevail. However, if there is a question as to the factual sufficiency of his claim, the within motion to strike must be denied so discovery can be completed. *Id*.

D.  **Defendants' Use of Miller's Likeness Is Not Incidental**

Defendants' use of Miller's likeness is far from incidental. Defendants cite, *Aligo v. Time-Life Books, Inc.*, 1994 WL 715605, at *3 (N.D. Cal. Dec. 19, 1994) to support its erroneous claim that its use of Miller's likeness is incidental. In *Aligo*,

the image, at issue, of the plaintiff "drifts across the screen against a background of other images from that era" for approximately four (4) seconds within a twenty-nine (29) minute television infomercial. *Id*. In direct contrast, Miller is one of five professional skateboards in the videogame. (Hedgpeth Declaration, ¶¶ 4 and 6). Moreover, Miller's likeness is used extensively in Defendants' marketing and promotional materials for the *Skater XL* videogame. (Complaint, ¶ 11).

Defendants also cites *Davis,* erroneously claiming that the four factor test used to determine if an unauthorized use is incidental weighs in its favor. To the contrary, all of the factors demonstrate that Defendants' use of Miller's likeness is not incidental.

'(1) whether the use has a unique quality or value that would result in commercial profit to the defendant; (2) whether the use contributes something of significance; (3) the relationship between the reference to the plaintiff and the purpose and subject of the work; and (4) the duration, prominence or repetition of the name or likeness relative to the rest of the publication.'

*Id.* at 1180. (quoting *Aligo*). The Ninth Circuit, in finding for the plaintiffs in *Davis*, analyzed the first two factors of the test stating, "EA goes to substantial lengths to incorporate accurate likenesses of current and former players," in its games, which on its own demonstrates that the use of the plaintiffs' likenesses was valuable to EA. *Id*., at 1181. The fact that Defendants actively sought out Miller in order to use his likeness proves that it is commercially valuable to Defendants, ipso facto. (Hedgpeth Declaration, ¶ 6). Easy Day has gone to great lengths to replicate the likenesses of Miller and the four other professional skaters in its realistic skateboarding videogame. (*Id*., ¶ 3).

"Under the third and fourth factors, the former players' likenesses are featured prominently in a manner that is substantially related to the main purpose and subject of Madden NFL—to create an accurate virtual simulation of an NFL game." *Davis*, at 1181. Again the facts here are nearly identical to those in *Davis*. Miller's likeness is prominently used as one of the five professional skaters in a

simulation skateboarding videogame. And unlike the plaintiffs in *Davis*, Defendants went even further and used Miller's likeness extensively in the promotion of the videogame. (Complaint, ¶ 11). Defendants' use of Miller's likeness is anything but incidental.

Analogously, Defendants' unauthorized use of Miller's likeness in its promotional material for *Skater XL* is also not protected by the First Amendment. The advertisements did not report on a matter that is of a public interest and is not protected by the incidental us doctrine. *Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089, 1100 (E.D. Cal. 2009). Defendants' use violated Miller's publicity rights.

**E.    Miller Should be Awarded Attorney's Fees and Costs**

Miller is able to make out a prima facie showing that he will to prevail on his claims. "The district court denied EA's motion, … concluding that the plaintiffs established a reasonable probability they will prevail on their claims. 'Reasonable probability' ... requires only a 'minimum level of legal sufficiency and triability.'" *Davis*, at 1177 (quoting Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 598, 95 U.S.P.Q.2d 1647 (9th Cir. 2010). Miller has clearly demonstrated that: (1) Defendants do not have a First Amendment right to use his likeness without his consent; (2) he did not consented to Defendants' use of his likeness (or at worst it is a question of fact and a motion to strike is to be denied); and (3) Defendants' use of his likeness is not incidental. "As the prevailing party on its Motion to Strike, Plaintiff is presumed entitled to reasonable attorneys' fees. See Cal. Civ. Proc. Code § 425.16(c)(1)." *Zhang v. American Franchise Regional Center, LLC*, 2016 WL 9137637 at *1 (C.D. Cal. July, 20, 2016). Miller is entitled to receive attorneys' fees.

## IV.   CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion to strike.

Dated: March 1, 2021						LAW OFFICES OF MATTHEW MILLER


							By: ____*/s/ Matthew Miller*____
							Matthew Miller
							Attorney for Plaintiff Zachary Miller